TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-01-00717-CV







Ronald Allison/Fire Insurance Exchange, Appellants


v.


Fire Insurance Exchange, a Member of the Farmers Insurance Group/Mary Melinda

Ballard and Ronald Allison, Individually and as Next Friends for

Reese Allison, a Minor, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT

NO. 99-05252, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING






 In June 2001, a Travis County jury awarded a verdict for over thirty-two million
dollars against Fire Insurance Exchange, a member of the Farmers Insurance Group ("FIE"), for its
handling of Mary Melinda Ballard's (1) homeowner's insurance claims, which began as a single claim
for water damage to a hardwood floor and evolved to include mold contamination of the entire house
and outbuildings. FIE contends in eleven issues on appeal that the evidence was legally and factually
insufficient to support the jury's liability findings; the district court erred in denying transfer of
venue to Hays County; the evidence was legally and factually insufficient to support the jury's
findings that FIE failed to appoint a competent, independent appraiser and that the appraisal decision
was rendered as a result of fraud, accident, or mistake; the district court abused its discretion in
numerous evidentiary rulings; there was no evidence of a knowing violation; the punitive damages
award is excessive; there was no evidence to support the mental anguish award; there was
insufficient evidence to support the attorneys' fees award; and there was no basis for the statutory
penalty under article 21.55 of the insurance code. See Tex. Ins. Code Ann. art. 21.55, § 6 (West
Supp. 2003).

 We recognize the constraints on this Court in its review of this hotly disputed case 
and the importance of according the proper degree of deference to the fact finder. We have carefully
reviewed the entire record. We hew to the record below despite the metamorphosis of the parties'
theories on appeal. We hold that probative evidence supports the district court's denial of FIE's
motion to transfer venue to Hays County. We further conclude that the district court did not abuse
its discretion in the evidentiary rulings of which FIE complains. We also find sufficient evidence
to uphold the jury's findings that FIE breached its duty of good faith and fair dealing toward Ballard
and that FIE committed a Deceptive Trade Practices Act (DTPA) violation. We find insufficient
evidence, however, to support the jury's findings of unconscionability or fraud. We additionally find
insufficient evidence to support the jury's findings that FIE failed to appoint a competent,
independent appraiser or that the appraisal decision was a result of fraud, accident, or mistake. 
Because the court's charge specified that findings of either a breach of the duty of good faith and fair
dealing or a DTPA violation are sufficient to uphold the jury's award of actual damages, we affirm
the actual damages award in part, in the amount of $4,006,320.72, in addition to prejudgment and
postjudgment interest as stated in the final judgment. We reverse the award of $176,000 for
Ballard's reasonable and necessary costs of the appraisal process.

 We further conclude that there is no evidence to support the jury's finding that FIE
"knowingly" breached its duty of good faith and fair dealing toward Ballard. Because a finding of
a knowing violation is required to uphold punitive and mental anguish damages, we reverse the
jury's awards for these damages and render judgment that Ballard take nothing for punitive and
mental anguish damages. We uphold the district court's award of the article 21.55 statutory penalty
in part and remand the penalty for recalculation in accordance with this opinion. We find sufficient
evidence to support the award of attorneys' fees but cannot say that the amount of the award is
reasonable, given our significant reduction of the jury's damages awards. Therefore, we remand the
issue of attorneys' fees to the district court for further proceedings consistent with this opinion.

 Ronald Allison, Ballard's husband, filed a separate appeal, contending that the district
court erred in granting FIE's motion to exclude Allison's causation experts and in turn granting FIE's
no-evidence motion for partial summary judgment pertaining to Allison's personal injury claims. 
Because we find no error in the district court's rulings, we affirm the district court's rulings in
granting FIE's motion to exclude his causation experts and no-evidence motion for partial summary
judgment pertaining to Allison's personal injury claims. Accordingly, we affirm the district court's
judgment dismissing Allison's personal injury claims.


BACKGROUND

 In 1990, Ballard bought a large house in Dripping Springs, Texas, for $275,000 in
a foreclosure sale. The main house was approximately 7,400 square feet, with several outbuildings,
including a nanny's apartment (also referred to as the groundskeeper's house), a garage, and a barn. 
In late 1992, Ballard began insuring the house with FIE. The amount of coverage remained steady
over the next few years, except for cost-of-living adjustments. The coverage in late 1998 was
$313,000 for the house and $187,800 for the contents.

 Within a couple of years before the claims at issue, which began in December 1998,
the Ballard house had a few plumbing leaks. In 1996 and 1997, Ballard filed two claims for
plumbing leaks caused by frozen pipes; FIE paid $60,000 to $70,000 for the 1997 claim. She did
not make another claim until December 1998 but continued to have plumbing leaks. In late 1997,
Ballard had a toilet leak repaired in the downstairs half bathroom, which required another repair in
January 1998. The leak caused damage to the bathroom carpet pad and wood subflooring, both of
which were replaced in February 1998. The same month, Ballard notified Richard Roberts of
Double R Floors that some of the boards in the downstairs hardwood floor were warping. Roberts
took a moisture reading in the area of warping, which read nineteen to twenty percent. The normal
moisture content of hardwood floors is around twelve percent. He then replaced some of the boards.

 The plumber returned a third time to repair the half bath toilet leak in July 1998. In
August 1998, Ballard notified Roberts of more hardwood floor warping and buckling. He took
another moisture measurement, which was seventeen to eighteen percent, then replaced more boards. 
In October 1998, Ballard called Roberts again to report more hardwood floor damage. The moisture
measurement was fifteen to sixteen percent, and Roberts replaced more boards. Roberts examined
the floor again in December 1998 and took a moisture reading of fourteen to fifteen percent. At that
time, Roberts said that the damage was too extensive to do any more spot repairs. He recommended
that Ballard file a claim under her homeowner's insurance policy.

 On December 17, 1998, Ballard filed a claim with FIE for the water damage to the
hardwood floor. An outside adjuster inspected the floor on December 22 and at first opined that the
damage was caused by foundation settling, which is not covered under the homeowner's policy. 
After seeing two areas of water damage, he reconsidered and requested plumbing tests. The claim
was assigned to Theresa McConnell, an adjuster in FIE's Austin foundation claims office, who
received the file on December 30, 1998. McConnell's original estimate of the claim was around
$100,000, and her level of authority was $20,000.

 On the same day, the Gerloff Company, a plumbing contractor, performed tests at
FIE's request and found no leaks. McConnell contacted Jeff Jackson, a civil engineer, to determine
the amount and cause of damage to the hardwood floor. In the meantime, Ballard obtained bids to
replace the hardwood floor, ranging from approximately $89,000 to $171,000. The $89,000 bid,
from Boatright Floors, increased to $127,950 after Ballard requested that the floor be custom made,
not manufactured, as was the original floor.

 McConnell and Jackson went to the Ballard home on January 7, 1999, so that Jackson
could inspect the damage. Jackson found two sources of moisture, one in the half bathroom and one
around the refrigerator. On January 11, McConnell sent a letter to Ballard stating that "complete
plumbing tests of your residence were conducted by Gerloff Co., Inc. No leaks were located in the
plumbing system of your residence." On January 12, Jackson requested additional testing of the
moisture sources. The additional test showed that the moisture level of the floor was twelve percent.
Ballard sent a letter to McConnell expressing concern that the buckled floors presented a tripping
hazard; McConnell suggested temporary repairs while the claim was being investigated, including
covering the areas with carpet or replacing the buckled pieces with plywood. Ballard agreed to
carpeting the entire floor or replacing the boards in "trouble" areas, but the temporary repairs were
never made.

 McConnell requested an appraisal of the house by an independent appraiser because
she was concerned that the house was underinsured. The appraiser valued the house at
approximately $749,000. McConnell notified Ballard of the appraisal, and Ballard requested
increased coverage if her current coverage was not adequate. In early March, FIE increased the
coverage to $750,000 for the house and $450,000 for the contents.

 In the meantime, on February 8, McConnell sent a letter to Ballard stating that FIE
needed a forty-five-day extension to complete the claim investigation. At approximately this same
time, Ballard hired an attorney to represent her. On February 24, FIE paid Ballard $108,316.50 for
accidental water discharge damage to the floor, based on the $127,950 Boatright estimate, less
depreciation and the deductible. FIE imposed an underinsurance penalty, paying the depreciated
value instead of replacement cost, because the house, recently reappraised, was insured for only
$313,000 at the time of the December 1998 claim.

 On March 4, McConnell and contractors went to the Ballard home to inspect newly
discovered damage, which was assigned a new claim number. Ballard's lawyer was present for this
meeting and notified FIE in writing on March 11 that he was representing Ballard and that all contact
concerning the claims should be with him instead of Ballard. At Ballard's request, FIE sent a
technician to determine if her refrigerator was still leaking; the report showed additional damage
behind the refrigerator.

 In early April, Ballard met Bill Holder, an indoor air quality consultant, on a plane
flight. Upon hearing about the damage to Ballard's house and physical symptoms that her family
was having, Holder suggested that she might have a mold problem. Holder came to the Ballard
house on April 5 at Ballard's insistence to take some air samples. The samples contained mold
spores, including a type of mold called stachybotrys, which produces toxins that may cause health
problems. On April 7, Ballard's lawyer sent a letter notifying FIE of the mold findings. Ballard,
concerned about possible health effects of the mold, moved with her husband, Ron, and three-year-old son to the nanny's apartment. FIE's attorney suggested on April 8 that the parties mediate their
dispute. Meanwhile, Holder met with Ballard, McConnell, and Steve Shelburne, McConnell's
supervisor, on April 13 to discuss the mold findings. At the meeting, Holder explained the possible
health effects of mold and that mold grows "exponentially."

 FIE sent engineers from Rimkus Consulting to take air samples on April 14. Holder
and others returned to the house to conduct tests on April 21. On April 23, Holder told Ballard that,
based on the new test results, she and her family immediately needed to move out of the house. 
Ballard's family took Holder's advice and left the house that day, leaving behind their belongings. 
They and their nanny moved into the Four Seasons Hotel in Austin, which FIE agreed to pay for until
a more permanent location was found. Ballard and her family moved out of the Four Seasons and
into a rental home around June 1.

 Around the same time, FIE paid about $8,000 for a shower leak claim in late April,
about $25,000 for damage related to an ice-maker leak claim in late April, and about $45,900 for
supplemental damage to walls and sheet rock in early May. On May 5, Ballard filed suit in Travis
County against FIE for breach of contract, deceptive trade practices, breach of the duty of good faith
and fair dealing in the claims handling process, and negligence.

 In preparation for mediation, also in May, Rimkus prepared an estimate to remediate
and repair the house and the contents, which totaled $382,000. Ballard's expert estimated that
remediation would cost approximately $1,015,500. The parties proceeded to mediation for three
days in late May, which ended unsuccessfully on May 27. That same day, FIE invoked the appraisal
provision of the insurance policy, available if the parties do not agree on valuation of a claim. Under
the appraisal provision, both parties were to choose independent appraisers to evaluate the claims.

 FIE notified Ballard in its May 27 letter that it had designated Peter de la Mora, a
structural engineer with extensive experience in the construction industry, as its appraiser. Ballard
chose as her appraiser an attorney, who had to resign a few months later because of trial obligations. 
Both parties agreed that Michael Schless, a former county-court-at-law judge, would be the
"umpire," as termed in the policy, to whom the appraisers would submit their differences if they
failed to agree on the amount of loss. Ballard then chose another attorney, Mike Duffy, as her
successor appraiser in November 1999.

 From May through July 1999, Ballard submitted additional claims for leaks in the
roof, two leaks in the water tank room, water damage in the garage and barn, water damage under
the kitchen sink, leaks in the nanny's apartment, loose tiles on the porch, and a fountain leak. In
June, Sandra Clanton replaced Theresa McConnell as the adjuster. On August 30, FIE paid
approximately $382,000 for mold remediation and repair of the house and contents. Ballard's
attorney returned the checks on the ground that the payments were based on "invalid" bids. In
February 2000, FIE again tendered checks for approximately $382,000, which Ballard's attorney
deposited into the registry of the court.

 The appraisal process continued for several months, then the appraisers met for four 
days in November 2000 to determine the amount of loss. The appraisal decision, issued on
November 16, 2000, awarded $1,287,092.72, deducting amounts that FIE had previously paid, for
the house, its contents, and additional living expenses. Although both appraisers and the umpire
signed the decision, only FIE's appraiser and the umpire agreed to the amount of the award. On
November 18, FIE sent checks for the amount of the appraisal decision to Ballard's attorney, who
again deposited the checks into the registry of the court.

 Meanwhile, the lawsuit proceeded, with the parties conducting discovery and various
hearings. FIE filed a motion to transfer venue to Hays County, where the house was located, on the
ground that venue was mandatory in Hays County because this was a property damage claim. The
district court denied the motion to transfer venue in November 1999. FIE later sought to exclude
Ronald Allison's personal injury claims on the ground that the toxic effects of mold were not
sufficiently established in the scientific community. Just before trial, the district court excluded
Allison's claims on the basis that his expert witnesses did not have reliable epidemiological studies
about the health effects of exposure to mold.

 The case proceeded to trial on May 7, 2001. The jury began deliberations on May 30,
2001 and returned a verdict in favor of Ballard the next day. The jury awarded $2,547,350 to replace
the home; $1,154,175 to remediate the home; $2,000,000 to replace the contents of the home;
$350,000 for past and future additional living expenses; $176,000 for Ballard's costs of the appraisal
process; $5,000,000 for Ballard's mental anguish; $12,000,000 in punitive damages; and $8,891,000
for attorneys' fees. The district court rendered a final judgment on October 30, 2001, for over $33
million, reducing actual damages by $2,045,204.28 (the total amount that FIE had already paid to
Ballard on her claims) and including prejudgment interest and a statutory penalty under article 21.55
of the insurance code on portions of the award.

 FIE filed motions for new trial, for remittitur, and to modify the judgment. The
district court denied the motion for remittitur. The motions for new trial and to modify the judgment
were overruled by operation of law. Allison appeals the district court's rulings concerning the
exclusion of his causation expert witnesses. FIE appeals all of the jury's findings and several district
court rulings.


ALLISON'S APPEAL

 In two issues, Allison urges that the district court erred in granting FIE's
Daubert/Robinson motion to exclude causation opinions of expert witnesses and as a result granting
FIE's no-evidence motion for partial summary judgment as to Allison's personal injury claims. See
Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549 (Tex. 1995).


FIE's Motion to Exclude Causation Opinions

 In his first issue, Allison contends that the district court erred in granting FIE's
motion to exclude causation opinions of expert witnesses. In Robinson, the Texas Supreme Court
held that rule of evidence 702 requires proponents of scientific expert testimony to satisfy the test
for admissibility formulated by the United States Supreme Court in Daubert. Tex. R. Evid. 702;
Robinson, 923 S.W.2d at 556. A two-part test governs whether expert testimony is admissible: (1)
the expert must be qualified, and (2) the testimony must be relevant and based on a reliable
foundation. Robinson, 923 S.W.2d at 556. According to this test, the trial judge must act as a
"gatekeeper" and decide whether a qualified expert's testimony is relevant and reliable. Daubert,
509 U.S. at 589; Robinson, 923 S.W.2d at 556-57. We review the district court's ruling under an
abuse of discretion standard. Robinson, 923 S.W.2d at 558; Olin Corp. v. Smith, 990 S.W.2d 789,
797 (Tex. App.--Austin 1999, pet. denied).

 "The court in discharging its duty as gatekeeper must determine how the reliability
of particular testimony is to be assessed." Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d
713, 726 (Tex. 1998). In Robinson, the Texas Supreme Court recognized several nonexclusive
factors enumerated by the court in Daubert to guide trial courts in acting as gatekeepers to assess the
reliability of scientific expert testimony:


 the extent to which the theory has been or can be tested; 


 the extent to which the technique relies upon the subjective interpretation of the
expert; 


 whether the theory has been subjected to peer review and/or publication; 


 the technique's potential rate of error; 


 whether the underlying theory or technique has been generally accepted as valid
by the relevant scientific community; and 


 the non-judicial uses which have been made of the theory or technique.



Robinson, 923 S.W.2d at 557 (citations omitted). A trial court must "focus solely on the validity of
principles and methodology underlying the testimony, not the conclusions generated." North Dallas
Diagnostic Ctr. v. Dewberry, 900 S.W.2d 90, 95 (Tex. App.--Dallas 1995, writ denied). If an expert
relies on unreliable foundational data, any opinion drawn from that data is likewise unreliable.
Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex. 1997).

 We now determine whether the district court abused its discretion in excluding the
testimony of Allison's causation expert witnesses. A reviewing court cannot conclude that a trial
court abused its discretion merely because, in the same circumstances, it would have ruled differently
or the trial court committed a mere error in judgment. Robinson, 923 S.W.2d at 558. The test is not
whether the facts present an appropriate case for the trial court's action in the opinion of the
reviewing court. Id. Rather, we will gauge an abuse of discretion by whether the trial court acted
without reference to any guiding rules or principles. Id. Thus, a trial court enjoys wide latitude in
determining whether expert testimony is admissible. See Olin, 990 S.W.2d at 795.

 Stachybotrys was discovered in the Ballard home in early April 1999. The family
moved from the main house to the nanny's apartment, then moved into a hotel on April 23, 1999,
after mold was also discovered in the apartment. Allison began having increasing problems with
concentration and memory in April through July 1999. After seeing several doctors in Austin,
Allison was diagnosed with a type of brain damage called toxic encephalopathy. Several medical
professionals, including two leading experts in the study of the health effects of molds and
mycotoxins, (2) Wayne A. Gordon, Ph.D. and Eckardt Johanning, M.D., agreed that exposure to mold
caused Allison's toxic encephalopathy.

 Toxic tort cases require proof of both general and specific causation about the effects
of the toxic substance. Havner, 953 S.W.2d at 714. "General causation is whether a substance is
capable of causing a particular injury or condition in the general population, while specific causation
is whether a substance caused a particular individual's injury." Id. One can prove general causation
either through experiments to show that a substance is capable of causing a particular injury or by
attempting to show that exposure to a substance increases the risk of a particular injury. Id. at 714-15. Specific causation cannot be based on inferred general causation; general causation must be
affirmatively proved. Among the underlying data to support Allison's proof of general causation
was a study by Dr. Gordon and Dr. Johanning of twenty people who were exposed to mold in a
building. The district court found that although the experts' foundational data to prove general
causation met the requirements of Daubert and Robinson, the data was unreliable according to the
factors discussed in Havner.

 The question in Havner was whether the experts' foundational data was sufficiently
reliable to show that the drug Bendectin caused birth defects. In Havner, as here, the underlying data
included epidemiological studies, which "examine existing populations to determine if there is an
association between a disease or condition and a factor suspected of causing that disease or
condition." Id. at 715. The Havner court determined that for an epidemiological study to be a
reliable foundation, it must be unbiased in its design, otherwise properly designed, properly
executed, and show that exposure to the substance more than doubles the risk of injury. Id. at 717-19. Another factor for determining if an epidemiological study is reliable is that it must be capable
of repetition with the same results ninety-five percent of the time, known as a confidence interval
of ninety-five percent. Id. at 723.

 Allison argues that the district court incorrectly applied Havner because "[t]he
decision clearly states that epidemiology is a permissive, not mandatory, type of evidence that a
plaintiff may choose in a toxic tort case." But the Havner court concluded that if an expert relies on
epidemiological studies, those studies must meet certain criteria. Id. Considering the totality of the
evidence presented by Allison, a crucial underpinning for the opinions of Allison's causation experts
was an epidemiological study; therefore, the district court appropriately determined that the factors
discussed in Havner applied.

 Dr. Gordon testified in his deposition that calculation of a confidence interval for the
results of the study was "premature." A calculation of the risk factor was also premature. 
Additionally, Dr. Gordon could not say whether the techniques used were generally accepted. The
epidemiological study on which Allison's experts relied therefore does not meet the Havner
requirement of a ninety-five percent confidence interval, nor does it show that exposure to the
substance more than doubles the risk of injury. Id. at 717-18, 722-23. Further, the causation experts'
testimony was not based on a reliable foundation as required by Havner. If an expert relies on
unreliable foundational data, any opinion drawn from that data is likewise unreliable. Id. at 714. 
Because Allison did not establish a reliable foundation for the admission of general causation
evidence, we need not address the evidence relating to specific causation. Therefore, we cannot say
that the district court abused its discretion by excluding the testimony of Allison's causation experts. 
Accordingly, we overrule Allison's first issue and uphold the district court's order excluding the
testimony of Allison's causation experts.


FIE's No-Evidence Motion for Partial Summary Judgment

 In his second issue, Allison contends that the district court erred in granting FIE's no-evidence motion for partial summary judgment as to Allison's personal injury claims. A party
seeking a no-evidence summary judgment must assert that no evidence exists as to one or more of
the essential elements of the nonmovant's claims on which it would have the burden of proof at trial. 
Holmstrom v. Lee, 26 S.W.3d 526, 530 (Tex. App.--Austin 2000, no pet.). A no-evidence summary
judgment is properly granted if the nonmovant fails to bring forth more than a scintilla of probative
evidence to raise a genuine issue of material fact as to an essential element of the nonmovant's claim
on which the nonmovant would have the burden of proof at trial. See Tex. R. Civ. P. 166a(i);
Havner, 953 S.W.2d at 711. If the evidence supporting an element rises to a level that would enable
reasonable, fair-minded persons to differ in their conclusions, then more than a scintilla of evidence
exists. Havner, 953 S.W.2d at 711. Less than a scintilla of evidence exists when the evidence is "so
weak as to do no more than create a mere surmise or suspicion" of fact, and the legal effect is that
there is no evidence. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983). A no-evidence
summary judgment is essentially a directed verdict granted before trial, to which we apply a legal
sufficiency standard of review. Jackson v. Fiesta Mart, 979 S.W.2d 68, 70 (Tex. App.--Austin
1998, no pet.).

 When, as here, the summary judgment states the ground or grounds on which the
district court based its decision to render summary judgment, we will affirm the summary judgment
if one of those grounds is meritorious. See State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380
(Tex. 1993); State Farm Mut. Auto. Ins. Co. v. Nguyen, 920 S.W.2d 409, 410 (Tex. App.--Houston
[1st Dist.] 1996, no writ). The district court granted the motion based on the exclusion of Allison's
causation experts. Because Allison could no longer prove the essential element of proximate cause
in his personal injury claims, the district court properly granted FIE's no-evidence motion for partial
summary judgment as to Allison's personal injury claims. Therefore, we overrule Allison's second
issue and affirm the district court's judgment dismissing Allison's personal injury claims.


FIE'S APPEAL


 FIE contends in eleven issues, with several sub-issues, that the evidence was legally
and factually insufficient to support the jury's liability findings; the district court erred in denying
transfer of venue to Hays County; the evidence was legally and factually insufficient to support the
jury's findings that FIE failed to appoint a competent, independent appraiser and that the appraisal
decision was rendered as a result of fraud, accident, or mistake; the district court abused its
discretion in numerous evidentiary rulings; there was no evidence of a knowing violation; the
punitive damages award is excessive; there was no evidence to support the mental anguish award;
there was insufficient evidence to support the attorneys' fees award; and there was no basis for the
statutory penalty under article 21.55 of the insurance code. We will address the venue issue first,
given the emphasis that both parties gave to this issue in their briefs and at oral argument.


Venue

 We must first decide whether venue was appropriate in Travis County, even though
the property at issue is located in Hays County. In its fourth issue, FIE contends that the district
court erred in denying its motion to transfer venue to Hays County. Because the civil practice and
remedies code allows the interlocutory review of an order denying a motion based on mandatory
venue and FIE elected not to seek such review, Ballard urges that FIE waived its right to transfer by
foregoing interlocutory review. We reject this position because it is inconsistent with the permissive
nature of sections 15.064 and 15.0642. Tex. Civ. Prac. & Rem. Code Ann. §§ 15.064(b), 15.0642
(West 2002) (allowing either an appeal of a venue determination after a trial on the merits or an
application for writ of mandamus to enforce a mandatory venue provision). Ballard brought suit in
Travis County on the permissive venue grounds that all or a substantial part of the actions giving rise
to the claim occurred there and that FIE's principal place of business is there. See id. § 15.002(a)(1),
(3) (general rule for venue). Section 15.002 lists several choices for permissive venue and applies
to all lawsuits unless a mandatory venue provision or another permissive venue provision applies. 
See id. § 15.002(a).

 FIE argues that venue lies in Hays County because the lawsuit is for damage to the
Ballard house, which is in Hays County. Asserting that the nature of Ballard's causes of action is
irrelevant, FIE further contends that "[i]f any of Ballard's causes of actions sought recovery of
damage to her home, the trial court had no discretion to deny the motion." We disagree. The venue
provision that FIE asserts is applicable and mandatory provides that


[a]ctions for recovery of real property or an estate or interest in real property, for
partition of real property, to remove encumbrances from the title to real property, for
recovery of damages to real property, or to quiet title to real property shall be brought
in the county in which all or a part of the property is located.



Id. § 15.011. When considering venue, we note that the legislature's use of the word "shall" in a
statute generally indicates the mandatory character of the provision. Id. § 15.004; Wichita County
v. Hart, 917 S.W.2d 779, 781 (Tex. 1996). Because of the mandatory nature of section 15.011, we
will strictly construe it and will not hold that it applies unless Ballard's suit falls clearly within one
of the categories in the section. See Bennett v. Langdeau, 362 S.W.2d 952, 955 (Tex. 1962)
(concerning the predecessor to section 15.011); Maranatha Temple, Inc. v. Enterprise Prods. Co.,
833 S.W.2d 736, 739 (Tex. App.--Houston [1st Dist.] 1992, writ denied).

 A defendant raises the question of proper venue by objecting to a plaintiff's venue
choice through a motion to transfer venue. See Tex. R. Civ. P. 86; Wichita County, 917 S.W.2d at
781. That mandatory venue lies in another county provides one ground for a motion to transfer
venue. See Tex. R. Civ. P. 86(3)(b). If a plaintiff's chosen venue rests on a permissive venue statute
and the defendant files a meritorious motion to transfer based on a mandatory venue provision, the
trial court must grant the motion. See Wichita County, 917 S.W.2d at 781. A trial court's erroneous
denial of a motion to transfer venue requires reversal of the judgment and remand for a new trial. 
See Tex. Civ. Prac. & Rem. Code Ann. § 15.064(b); Ruiz v. Conoco, Inc., 868 S.W.2d 752, 757
(Tex. 1993). In determining whether venue was proper, we review the entire record, including the
trial on the merits. Tex. Civ. Prac. & Rem. Code Ann. § 15.064(b); Ruiz, 868 S.W.2d at 758. If we
find probative evidence to support the district court's determination, even if there is a preponderance
of the evidence to the contrary, we will defer to the district court's determination. Ruiz, 868 S.W.2d
at 758.

 FIE argued at the hearing on its motion to transfer venue that although Ballard's case
involved multiple causes of action, including breach of contract, deceptive trade practices, breach
of the duty of good faith and fair dealing insurance claim, and Allison's personal injury claims, the
dominant purpose of Ballard's lawsuit was to recover damages to real property. Under this test, a
court looks to the dominant purpose of the lawsuit, solely from the facts alleged in the plaintiff's
petition, the rights asserted, and the relief sought, to determine whether it falls under a mandatory
venue provision. See Maranatha Temple, 833 S.W.2d at 738. FIE now argues on appeal that the
legislature abrogated the dominant-purpose test with the enactment of section 15.004 of the civil
practice and remedies code in 1995. (3) See Tex. Civ. Prac. & Rem. Code Ann. § 15.004 (if lawsuit
has two or more claims arising from same transaction or occurrence, with one claim governed by a
mandatory venue provision and another governed by a permissive venue provision, the mandatory
venue provision controls); see also Marshall v. Mahaffey, 974 S.W.2d 942, 947 (Tex.
App.--Beaumont 1998, pet. denied). We agree with FIE's current position to this extent: If we find
the mandatory provision applies but it is in conflict with a permissive rule, the mandatory provision
controls. Tex. Civ. Prac. & Rem. Code Ann. § 15.004; Wichita County, 917 S.W.2d at 781. (4) Upon
our review of the record, we conclude that although section 15.011 is a mandatory venue provision,
it does not apply here.

 FIE argues that the phrase "recovery of damages to real property" is not ambiguous,
but is instead "crystal clear." Because in 1995 the legislature reinstated the clause in section 15.011, (5)
FIE urges that the mandatory venue provision was thereby broadened to include any injury to
Ballard's home. By any reasonable construction, we may not read the provision by the expansive
interpretation that FIE would have us adopt. Even though FIE urges this Court to read "plain and
common meaning" into its reading of the statute, accepted principles of construction require that the
provision in question be construed in its present context and given a rational meaning.

 If we were to look at the words "recovery of damages to real property" in isolation,
we would concede that the phrase may be sufficiently broad to encompass the expansive reading
urged by FIE. But we do not construe statutory phrases in isolation; we read statutes as a whole. 
Contrary to FIE's assertion that the nature of the causes of action is irrelevant and that only the
remedy sought is relevant, section 15.011 specifically addresses five types of "actions" relating to
"Land"--the title of the section (6)--that mandate venue in a particular county. The actions are:


 for recovery of real property or an estate or interest in real property,


 for partition of real property,


 to remove encumbrances from the title to real property,


 for recovery of damages to real property, or


 to quiet title to real property.



Tex. Civ. Prac. & Rem. Code Ann. § 15.011. That the word "action" must be read to modify each
of these is clear beyond cavil. Thus, we must look to the "true" nature of the action to determine
whether the mandatory venue provision applies. Renwar Oil Corp. v. Lancaster, 276 S.W.2d 774,
775 (Tex. 1955); see also Yzaguirre v. KCS Res., Inc., 53 S.W.3d 368, 371 (Tex. 2001).

 Before the addition of the phrase "recovery of damages to real property," the venue
provision applied only when the suit directly involved a question of title to land. See, e.g.,
Yzaguirre, 53 S.W.3d at 371 (mandatory venue provision does not apply because suit does not
involve recovering real property or quieting title); Maranatha Temple, 833 S.W.2d at 738; Scarth
v. First Bank & Trust Co., 711 S.W.2d 140, 141-42 (Tex. App.--Amarillo 1986, no writ). We have
been cited to no authority that supports expanding the scope of the provision beyond questions
relating to the recovery of real property or affecting title to "land." Except to make it explicit that
the provision in question allows for the recovery of damages in such a suit relating to land, there is
no indication that the legislature sought to broaden the provision with the addition of the phrase. 
That the phrase "for recovery of damages to real property" was sandwiched between "to remove
encumbrances from the title" and "to quiet title" further bolsters our reading. Reading the relevant
phrase in its entire context, then, gives support for the more narrow interpretation. See 1 Scott
Brister, et al., Texas Pretrial Practice § 9.34 (2000).

 Were we to interpret the provision to allow for mandatory venue in all instances in
which any damages are sought relating to a dwelling, no matter the nature of the action, we believe
we would be extending beyond permissible bounds the statute's language. The doctrine of
construction, noscitur a sociis--a word is known by the company it keeps--seems particularly apt
here to avoid ascribing to one clause a meaning so broad that it is inconsistent with its accompanying
clauses, thus giving unintended breadth to the provision as a whole. See County of Harris v. Eaton,
573 S.W.2d 177, 181 (Tex. 1978) (Steakley, J., dissenting) (discussing the maxim of noscitur a
sociis: "the meaning of particular terms in a statute may be ascertained by reference to words
associated with them in the statute; and that where two or more words of analogous meaning are
employed together in a statute, they are understood to be used in their cognate sense, to express the
same relations and give color and expression to each other."). The phrase must be understood
against the background of what the legislature was attempting to accomplish in restoring a damage
provision to the section, thereby completing the availability of an array of remedies to actions
involving "land."

 Ballard brought actions for negligence, negligence per se, breach of contract,
deceptive trade practices, and breach of good faith and fair dealing in insurance claims handling, all
of which allegedly caused damages to the Ballard house. Because the suit does not involve
recovering real property or quieting title or seeking damages for such loss, the district court correctly
concluded that the mandatory venue provisions of section 15.011 do not apply. We therefore
overrule FIE's fourth issue.


Legal and Factual Sufficiency

 FIE next contends in several issues that the evidence is legally and factually
insufficient to support the jury's findings. We will first address the standards of review for 
challenges to legal and factual sufficiency. Challenges to the legal sufficiency of the evidence must
be sustained when the record discloses one of the following: (1) a complete absence of evidence of
a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than
a mere scintilla of evidence; or (4) the evidence established conclusively the opposite of a vital fact.
See Havner, 953 S.W.2d at 711. In reviewing legal sufficiency, we are required to determine
whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. See Transportation Ins. Co. v. Moriel, 879 S.W.2d 10,
25 (Tex. 1994).

 If a party is attacking the legal sufficiency of an adverse finding of an issue on which
it did not have the burden of proof, the attacking party must demonstrate on appeal that there is no
evidence to support the adverse finding. See Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983).
In reviewing a no-evidence issue, we are to consider only the evidence favoring the finding,
disregarding all direct and circumstantial evidence to the contrary. Lenz v. Lenz, 79 S.W.3d 10, 13
(Tex. 2002); Continental Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996).

 When reviewing a challenge to the factual sufficiency of the evidence, we must
consider, weigh, and examine all of the evidence in the record. See Plas-Tex, Inc. v. U.S. Steel
Corp., 772 S.W.2d 442, 445 (Tex. 1989). If a party is attacking the factual sufficiency of an adverse
finding on an issue to which the other party has the burden of proof, the attacking party must
demonstrate that there is insufficient evidence to support the adverse finding. See Westech Eng'g,
Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 196 (Tex. App.--Austin 1992, no writ). In
reviewing a factual insufficiency of the evidence challenge, we must first consider all of the evidence
that supports and is contrary to the jury's determination. See Plas-Tex, 772 S.W.2d at 445. We
should set aside the verdict only if the evidence that supports the jury finding is so weak as to be
clearly wrong and manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We may
not reverse merely because we conclude that the evidence preponderates toward an affirmative
answer. See Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988). To assist with the analysis of
FIE's legal and factual sufficiency challenges, we will summarize FIE's acts of which Ballard
complains.


The Complained-of Acts

 Although the trial was long and the arguments complex, each of Ballard's causes of
action revolve around the following core of complained-of acts:


 1. Plumbing test

 As part of FIE's insurance code violation, Ballard complains that Theresa McConnell
misrepresented to her that "complete" plumbing tests had been performed on the house even though
McConnell "secretly" thought that there might be other leaks. In December 1998, Ballard reported
a claim that her hardwood floor was water-damaged. FIE retained the Gerloff Company, a plumbing
contractor, to determine whether there was an ongoing leak causing the floor to remain wet. On
January 11, 1999, McConnell forwarded a copy of the Gerloff report to Ballard. The report
described the procedures employed and time taken to test the building drain piping, domestic water
piping, and air conditioning condensate lines, and further stated that no shower pan test was
conducted. Enclosing a copy of the plumbing test results, McConnell represented in a cover letter
that "[c]omplete plumbing tests of your residence were performed . . . . No leaks were located in the
plumbing system of your residence." A Gerloff plumber testified that the tests were complete
according to his company's procedures. He testified that he was asked to do a complete test and that
it was a "complete test of the plumbing system, going by our procedures." The tests were complete
in the context of the leaks that existed on December 30, 1998, when the testing was done. 
McConnell's concerns about the possibility of additional leaks were not secret. Despite the report
that no leaks were found, she contacted Jeff Jackson, a civil engineer, to determine the amount and
cause of damage to the hardwood floor. In her cover letter enclosing the Gerloff report, McConnell
stated that Jackson had been retained in the investigation of the claim and the "cause of the problem"
continued.


 2. Completion-of-claim letter

 McConnell wrote a letter to Ballard on February 8 saying that FIE required a forty-five-day extension because "[t]he additional time is needed to complete our claim investigation." 
McConnell admitted at trial that FIE had all of the information that it needed to evaluate the claim
but that she needed the additional time to obtain the authority from supervisors to pay the claim
because she did not have that level of authority. FIE paid the claim on February 24, 1999, less than
three weeks after McConnell's letter.


 3. Refusal to pay claim/failure to promptly pay

 Ballard also argues that FIE violated the insurance code because FIE admitted that
as of May 17, 1999, it had obtained all of the information it needed to pay for remediation of the
house. She urges that FIE tendered insufficient and untimely payments. Because of FIE's piecemeal
payments and intentional delays in paying her claims after it had all of the information it needed on
May 17, 1999, Ballard contends that FIE refused to pay the claims without conducting a reasonable
investigation of the claims and that it failed to attempt in good faith to effectuate a prompt, fair, and
equitable settlement of the claims when its liability had become reasonably clear.

 FIE paid the first claim for hardwood floor damage on February 24, 1999. It based
the payment on a bid from Boatright Floors, less depreciation and the deductible. FIE paid the
depreciated value instead of replacement cost because the house was underinsured. Ballard
immediately claimed that this was a partial payment because she thought the Boatright bid was too
low. Thereafter, Ballard began submitting other claims. Within the next couple of months, she
submitted a claim for a shower leak, ice maker leak, and supplemental damage to sheet rock and
walls. FIE paid all of these claims, which Ballard again accepted as partial payments. Nevertheless,
Ballard contends that because of the completion-of-claim letter, plumbing test letter, and FIE's
invocation of the appraisal provision, full payment of these claims and other pending claims was
delayed.


 4. Denial of coverage

 Ballard argues that FIE tried to deny the hardwood floor damage claim under an
exclusion in the policy for foundation problems. The first adjuster to handle the claim was Sean
Dollery, who visited the home on December 22, 1998. Although his initial reaction was that
foundation settling might be the cause of the hardwood floor damage, he changed his mind after
seeing the water damage to the floor. In response to her attorney's question--"About how long did
he talk to you about this being a slab settling problem?"-- Ballard testified: "Until Richard Roberts
got there [that day] and started pulling up boards that showed the migration of water." Dollery
stopped suggesting that it was a slab-settling problem "about 20 minutes after Richard Roberts had
pulled up some boards." From then on, FIE handled the hardwood floor damage as a covered claim.


 5. Sham and fraudulent bids

 Ballard complains that FIE intentionally paid her inadequate sums based on sham and
fraudulent bids FIE received from contractors who subsequently refused to perform the work for the
amount of the bids. These contractors were then retained by FIE as its experts in this litigation. FIE
obtained bids from many contractors during the course of handling the claims and paid the claims
according to its own valuation, assisted by the bids. FIE based the hardwood floor claim payment
on a bid from Boatright Floors, which was the lowest bid that it received. Ballard contends that the
payment was invalid because the Boatright bid was only good for thirty days and had expired by the
time that FIE made the payment on February 24, 1999. FIE counters that it did not receive the bid
until February 5, just a few weeks before it made payment. After mold was discovered in the Ballard
home, FIE hired Rimkus Consulting to prepare a remediation bid. Because Rimkus had no
experience in the relatively new field of mold remediation, its engineers talked with Ballard's
consultants to find out more about the process. The remediation bid that Rimkus submitted in
preparation for mediation was considerably less than the bid from Ballard's experts.

 Ballard also contends that FIE based its August 1999 payments on expired bids,
because two companies that had made bids would not do the work for Ballard at the prices they had
quoted to FIE. But by that time they had been retained as FIE's expert witnesses. Ballard further
contends that de la Mora's estimates during the appraisal process were not based on like kind and
quality. De la Mora testified that he determined like kind and quality replacement costs during the
appraisal process. One of the contractors who submitted a bid to de la Mora also testified that he
prepared his bid based on like kind and quality materials.


 6. Invocation of the appraisal provision


 Ballard urges four complaints concerning FIE's invocation of the appraisal provision:
(i) the mere invocation of the provision was a breach of its duty of good faith and fair dealing
because it was intended for the purposes of delay and to gain leverage in negotiations; (ii) FIE
deliberately appointed an appraiser who was not independent or competent; (iii) FIE refused to
include all of the pending claims in the appraisal; and (iv) FIE intentionally withheld estimates and
information from its own appraiser.

 Under Ballard's standard form homeowner's insurance policy, either party may
request an appraisal if it becomes apparent that the parties cannot agree on the value of a claim or
claims. FIE's employees testified that they invoke the appraisal provision rarely, only if it is
apparent that the parties cannot agree on the appraised value. FIE asserted the provision here after
an attempt to settle at mediation failed, although it was apparent long before then that Ballard and
FIE did not agree about the value of her claims.

 Peter de la Mora, a structural engineer who was FIE's appraiser, had a business
relationship with FIE before working on this appraisal. However, he has never been an employee
of FIE. Further, FIE instructed de la Mora to determine costs on his own, not from any figures that
FIE had. He had no restriction on receiving assistance from outside experts. He had years of
experience in the homebuilding industry.

 The letter invoking the appraisal provision listed three of the five claims that were
pending as of late May 1999. Ballard testified that she asked FIE to include all of the claims in the
appraisal but that FIE did not want to do that, suggesting the appraisal did not cover all of her claims. 
De la Mora testified that although the appraisal did not include all of the claim numbers, the fact that
the appraisal covered the entire house encompassed all of claims. Additionally, the amendment to
the appraisal decision stated that because "some of the claim numbers may have been improperly
included, and [o]thers may have been improperly excluded," "the Appraisal Decision was intended
to be a comprehensive statement" of the cost to remediate or replace the house, its contents, the
groundskeeper's house, plus additional living expenses, "considering only those claims which were
properly subject to the appraisal."


 7. Underinsurance

 The amount of insurance on the Ballard home was tied to the county tax appraisal,
not the resale value of the house. In 1996, Ballard's agent told her that the insurance coverage was
insufficient to cover the full value of the home. She replied that she wanted to keep the insurance
at the value of the tax appraisal, then signed a form rejecting an increase in coverage. The amount
of insurance on the home when Ballard filed the hardwood damage claim was $313,000. 
McConnell, concerned that the house might be underinsured, requested a property appraisal in
January 1999. After seeing that the appraised resale value was approximately $750,000, Ballard
requested an increase in her insurance coverage. Because this increase did not occur until after the
payment of the first claim, FIE imposed an underinsurance penalty on its payment of the hardwood
floor claim. It paid Ballard for the actual cash value of the floor, deducting depreciation, instead of
paying the full replacement value. Ballard contends that FIE thus misrepresented that her policy
covered replacement costs.


 8. Reservation-of-rights letter

 On December 30, 1998, FIE sent a standard form homeowner's policy reservation-of-rights letter, which restated exclusions from the policy that might apply. Insurance companies must
assert a reservation of rights or risk waiving any coverage defenses that they may have. See, e.g.,
State Farm Lloyds v. Borum, 53 S.W.3d 877, 892 (Tex. App.--Dallas 2001, pet. denied). The fact
that the form letter contained inapplicable exclusions for damage by "waves" and "earthquake" is
inconsequential. Furthermore, there was no evidence of any connection between this letter and how
FIE handled Ballard's claims, and coverage was not at issue.

 Having summarized FIE's acts of which Ballard complains, we now turn to FIE's
legal and factual sufficiency challenges to the jury's findings.


Breach of Duty of Good Faith and Fair Dealing

 FIE urges in its first issue that the evidence is legally and factually insufficient to
support the jury's finding that it breached its duty of good faith and fair dealing toward Ballard. FIE
further contends that the evidence is legally and factually insufficient to support a finding that its
alleged breach caused damages to Ballard. We disagree. Some evidence supports the jury's finding
that FIE breached its duty of good faith and fair dealing and that the breach caused damages to
Ballard.

 An insurer breaches its duty of good faith and fair dealing by denying or delaying
payment of a claim when "the insurer's liability has become reasonably clear." Tex. Ins. Code Ann.
art. 21.21, § 4(10)(a)(ii) (West Supp. 2003); Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 55 (Tex.
1997); id. at 69 (Hecht, J., concurring). "Liability for payment of a claim is reasonably clear when
it is no longer fairly debatable." Giles, 950 S.W.2d at 69 (Hecht, J., concurring). The statutory
standard and common-law standard for breach of the duty of good faith and fair dealing are identical. 
Mid-Century Ins. Co. v. Boyte, 80 S.W.3d 546, 549 (Tex. 2002) (citing Giles, 950 S.W.2d at 55; id.
at 69 (Hecht, J., concurring)). Evidence establishing only a bona fide coverage dispute does not
demonstrate breach of the duty of good faith and fair dealing. Provident Am. Ins. Co. v. Castaneda,
988 S.W.2d 189, 193 (Tex. 1998); State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 448 (Tex. 1997);
Moriel, 879 S.W.2d at 17.

 The issue of the breach of the duty of good faith and fair dealing "focuses not on
whether the claim was valid but on the reasonableness of the insurer's conduct" in handling the
claim. Lyons v. Millers Cas. Ins. Co., 866 S.W.2d 597, 601 (Tex. 1993). Reasonableness is
determined using an objective standard of whether a reasonable insurer under similar circumstances
would have delayed or denied payment of the claim. Aranda v. Insurance Co. of N. Am., 748 S.W.2d
210, 213 (Tex. 1988). Whether an insurer breached its duty of good faith and fair dealing is a fact
issue. Giles, 950 S.W.2d at 56. Moreover, the question of whether an insurer's conduct is
reasonable in the face of acknowledged liability is one peculiarly tailored to the province of the jury. 
See id. In determining whether the evidence is legally sufficient to support a judgment for breach
of the duty of good faith and fair dealing, we resolve all conflicts in the evidence and draw all
inferences in favor of the jury's findings. Id. at 51.

 There is some evidence from which a jury could find that FIE failed to attempt in
good faith to effectuate prompt, fair, and equitable settlement of claims after its liability had become
reasonably clear. See Tex. Ins. Code Ann. art. 21.21, § 4(10)(a)(ii); Giles, 950 S.W.2d at 56. FIE
does not challenge that its liability was reasonably clear. Its liability was only "fairly debatable" for
a brief time, when FIE's outside investigator, Sean Dollery, expressed his preliminary view that the
claim might not be covered. See Giles, 950 S.W.2d at 69 (Hecht, J., concurring). Ballard contends
that FIE, after its liability had become reasonably clear, delayed payment of the hardwood floor claim
through its plumbing test and completion-of-claim letters. She further contends that FIE breached
its duty of good faith and fair dealing toward her by invoking the appraisal provision in May 1999,
when at the same time it had all of the information that it needed to pay for remediation of the home. 
She argues that waiting for payment of her claims during the eighteen-month appraisal process
allowed mold to spread and cause irreparable damage to the house. While Ballard alleges that other
acts are part of the pattern of acts that violated article 21.21, these are the primary acts of which she
complains.

 Some evidence shows that McConnell's lack of authority or experience in handling
claims of this magnitude caused delays in processing the claims. McConnell knew on the first day
she received the claim that estimates to replace the hardwood floor were over $100,000. She had
a level of authority only to pay claims up to $20,000 and had never worked on a claim this large. 
Additionally, McConnell testified that she had sufficient information that liability was reasonably
clear on the hardwood floor claim as of February 1, 1999. Yet she wrote the February 8 letter to
Ballard, stating that FIE required a forty-five-day extension because "[t]he additional time is needed
to complete our claim investigation." McConnell admitted at trial that FIE had all of the information
that it needed to evaluate the claim but that she needed the additional time to obtain the authority
from supervisors to pay the claim because she did not have that level of authority. A jury could have
found that she misrepresented to Ballard why she needed more time to handle the claim. Ballard
argues also that McConnell made a misrepresentation in the "complete plumbing test" letter, when
in fact not all plumbing had been tested. Both McConnell and a plumber with the Gerloff Company
testified that the term "complete plumbing test" is not literally true, because the standard industry
test runs through underground systems only, not any pipes above the first floor. Although
McConnell correctly characterized the test that Gerloff performed, the jury could have reasonably
concluded that this statement was a misrepresentation.

 Other evidence called into question FIE's good faith handling of the claims. Ballard
testified that although she "begged" to remove the wood floor because it was a tripping hazard,
McConnell told her that she would "jeopardize coverage" if she removed the floor. McConnell
testified that Ballard could have removed the floor at any time after payment of the $108,000 to
replace the floor. Ballard countered that she did not want to remove the floor with the claim
investigation ongoing for months, even after she received the $108,000 payment. She testified that
she did not remove the floor "[b]ecause [FIE] kept calling for inspections. And if I had torn up the
floor, there would be nothing there for them to inspect." As part of the pattern of mishandling and
delay in handling her claims, Ballard also testified that FIE's large number of inspections were
designed to harass and cause further delay. McConnell countered that the inspections were necessary
to determine the cause of the water damage and because Ballard kept submitting claims for new
damage. The jury, as the trier of fact in this case, could have chosen to believe Ballard instead of
McConnell. A jury judges the credibility of witnesses and the weight given their testimony. Ford
v. Panhandle & Santa Fe Ry. Co., 252 S.W.2d 561, 563 (Tex. 1952); Trinity Indus., Inc. v. Ashland,
Inc., 53 S.W.3d 852, 862 (Tex. App.--Austin 2001, pet. denied). It is the jury's province "to resolve
conflicts and inconsistencies . . . in the testimony of different witnesses." Ford, 252 S.W.2d at 563.

 Further, Ballard presented some evidence of a pattern of failure to promptly pay that
caused further damage to the house. The jury heard evidence that FIE had all of the information that
it needed to pay the hardwood floor claim in early February but did not pay the claim until three
weeks later. Further, Ballard contended that every payment from FIE was insufficient to pay for the
damage, leading to further delays that caused the mold to spread. The jury heard additional evidence
that although McConnell admitted that FIE had all of the information that it needed to pay for
remediation of the house as of May 17, 1999, FIE instead invoked the appraisal provision after it
failed to settle the claims at mediation. During the appraisal process, which lasted eighteen months,
nothing was done to remediate the mold in Ballard's house. The mold continued to grow. This was
some evidence from which the jury could have determined that FIE delayed in paying the claims and
that the delay caused further damage to Ballard's house.

 An appellate court may not substitute its judgment when a jury's finding is grounded
in sufficient evidence. Trinity Indus., 53 S.W.3d at 862-63. We are required by the standards and
scope of review to credit verdicts grounded on probative evidence. Further, the legislature requires
us to "liberally construe[]" article 21.21. Tex. Ins. Code Ann art. 21.21, § 1(b) (West Supp. 2003)
("This Article shall be liberally construed and applied to promote its underlying purposes as set forth
in this section."); see also Rocor Int'l, Inc. v. National Union Fire Ins. Co., 77 S.W.3d 253, 260
(Tex. 2002); Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 384 (Tex. 2000).

Viewing the evidence in the light most favorable to Ballard, we hold that there is
some evidence to support the jury's finding that FIE failed to attempt in good faith to effectuate a
prompt, fair, and equitable settlement of Ballard's claims after its liability had become reasonably
clear and that this failure caused damages to Ballard. See Tex. Ins. Code Ann art. 21.21,
§ 4(10)(a)(ii). Weighing all of the evidence, we cannot say that it is so weak as to be clearly wrong
or manifestly unjust. Cain, 709 S.W.2d at 176. Accordingly, FIE's legal and factual sufficiency
challenges to the breach of the duty of good faith and fair dealing finding must fail. We overrule
FIE's first issue. Even if we were to apply the standard for breach of the duty of good faith and fair
dealing set forth in Aranda v. Insurance Co. of North America--that FIE had no reasonable basis
for delaying payment of the benefits of the policy and that it knew or should have known that it had
no reasonable basis for delaying payment--the evidence would support the finding. See 748 S.W.2d
at 213.

Because the court's charge specified that a finding of a breach of the duty of good
faith and fair dealing is sufficient to uphold the jury's award of actual damages, we affirm the actual
damages award in part, in the amount of $4,006,320.72, in addition to prejudgment and
postjudgment interest as stated in the final judgment. This amount takes into account the reduction
in the final judgment for the $2,045,204.28 that FIE had previously paid to Ballard, information that
the court's charge did not present to the jury. Elsewhere in the opinion, we will discuss the $176,000
award for Ballard's reasonable and necessary costs of the appraisal process.


DTPA Violation, Unconscionability, and Fraud

 FIE contends in its second issue that the evidence is legally and factually insufficient
to support the jury's findings that FIE engaged in deceptive trade practices, unconscionable conduct,
and fraudulent conduct. Ballard counters that FIE waived this argument because it did not properly
brief this issue. See Tex. R. App. P. 38.1(h). Because FIE's argument on this issue is grounded in
its lengthy discussion that it did not breach its duty of good faith and fair dealing, we find that FIE
sufficiently briefed this issue for the Court. The jury found that FIE violated the DTPA by engaging
in a false, misleading, or deceptive act or practice by (1) representing that services had or would have
characteristics or benefits that they did not have, (2) representing that services are or will be of a
particular standard or quality when they were of another, (3) representing that an agreement confers
or involves rights, remedies, or obligations that it did not have or involve, or (4) representing that
work or services have been performed, when the work or services were not performed. See Tex.
Bus. & Com. Code Ann. § 17.46(b)(5), (7), (12), (22) (West 2002).

 Ballard contends that the plumbing test letter was a misrepresentation about work
performed. We agree that this is some evidence to support the jury's finding of a DTPA violation. 
The jury may have reasonably concluded that McConnell's characterization of the test was a
misrepresentation of work performed. Additionally, the jury could have concluded from the
evidence that Ballard's reliance on the plumbing test letter caused further damages to the house. 
Viewing the evidence in the light most favorable to Ballard, the evidence is legally sufficient to
support the jury's finding that FIE committed a DTPA violation. Weighing all of the evidence, we
cannot say that it is so weak as to be clearly wrong or manifestly unjust. Cain, 709 S.W.2d at 176. 
We overrule this part of FIE's second issue and affirm the jury's finding that FIE committed a DTPA
violation.

 The jury also found that FIE engaged in an unconscionable action or course of action,
which is "an act or practice that, to a consumer's detriment, takes advantage of the lack of
knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus.
& Com. Code Ann. § 17.45(5)(A) (West 2002). "Gross," as used in this section, means "glaringly
noticeable, flagrant, complete and unmitigated." Nicolau, 951 S.W.2d at 451. Ballard's sole
contention in this regard is that any misrepresentation by FIE equates with unconscionable conduct. 
That is not the law. "[N]ot every misrepresentation of fact, even an intentional one, constitutes
unconscionable conduct." Latham v. Castillo, 972 S.W.2d 66, 72 (Tex. 1998). The test is whether
the consumer was taken advantage of to a grossly unfair degree. Id. The record does not provide
support to satisfy this test. Having reviewed the record, we find no evidence to support the finding
that FIE engaged in an unconscionable action or course of action.

 The jury further found that FIE committed fraud against Ballard. A fraud cause of
action requires: (1) a material misrepresentation, (2) that was either known to be false when made
or was asserted without knowledge of its truth, (3) that was intended to be acted upon, (4) that was
relied upon, and (5) that caused injury. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001). 
Ballard makes no citation to the record to support her fraud claim, nor does she point to any actions
that might have been fraudulent. In our review of the record, we find no evidence to support this
claim. Having found sufficient evidence to support the jury's finding of a DTPA violation, but no
no evidence to support the jury's findings of unconscionability and fraud, we overrule FIE's legal
and factual sufficiency challenge to the DTPA violation finding and sustain FIE's challenges to the
unconscionability and fraud findings. Therefore, we affirm the jury's finding that FIE committed
a DTPA violation. The court's charge specified that a finding of a DTPA violation is sufficient to
uphold the jury's award of actual damages. Based on this finding, we affirm the actual damages in
the amount of $4,006,320.72, in addition to prejudgment and postjudgment interest as stated in the
final judgment. We reverse the jury's findings that FIE engaged in unconscionable and fraudulent
conduct and render judgment that Ballard take nothing on her claims for unconscionability and fraud.


Appraisal Decision

 FIE contends in its third issue that Ballard is bound by the appraisal decision because
the evidence is legally and factually insufficient to support the jury findings that the appraisal was
the result of fraud, accident, or mistake and that the appraiser was not competent and independent. 
FIE further contends that Ballard waived any complaints about de la Mora because she did not
challenge him as the appraiser until after the appraisal decision was made.

 An appraisal decision made pursuant to the provisions of an insurance contract is
binding and enforceable. Wells v. American States Preferred Ins. Co., 919 S.W.2d 679, 683 (Tex.
App.--Dallas 1996, writ denied). Every reasonable presumption will be indulged to sustain an
appraisal decision. Providence Lloyds Ins. Co. v. Crystal City Indep. Sch. Dist., 877 S.W.2d 872,
875 (Tex. App.--San Antonio 1994, no writ). An award may be set aside in three instances: when
it was (1) made without authority; (2) the result of fraud, accident, or mistake; or (3) not made in
substantial compliance with the terms of the contract. Wells, 919 S.W.2d at 683; Providence Lloyds,
877 S.W.2d at 875-76.

 Ballard's homeowner's insurance policy, a standard form policy promulgated by the
Texas Department of Insurance, contains an appraisal clause. Under this clause, either party may
invoke an appraisal if the party disagrees about the value of a claim or claims. Each party then hires
its own appraiser. If the two appraisers cannot agree on the value, they select an umpire, or a district
judge will appoint one if the appraisers cannot agree on an umpire. A decision signed by any two
of the three is binding as to the value of the claim.

 FIE invoked the appraisal provision on May 27, 1999, the day that the parties failed
to reach a settlement at mediation. FIE chose as its appraiser Peter de la Mora, a structural engineer
who had performed appraisals for FIE approximately four or five times. Ballard chose an attorney
as her appraiser, who had to resign a few months later because of trial obligations. Both parties
agreed that Michael Schless, a former county court at law judge, would be the umpire. Ballard then
chose another attorney, Mike Duffy, as her successor appraiser in November 1999.

 Over the course of the next year, the appraisers gathered estimates for remediation
and replacement of the Ballard house. In November 2000, de la Mora, Duffy, and Schless worked
for four days to determine the appraisal decision. They met at the Ballard house with various
experts, then de la Mora and Duffy discussed their proposals with Schless. On November 16, 2000,
they issued an appraisal decision in the amount of $1,287,092.72, which took into account payments
that FIE had already made to Ballard. Both appraisers and Schless signed the decision, but Duffy,
Ballard's appraiser, disputed the amount of the award. Under the terms of the insurance policy, the
appraisal decision was binding because two of the three agreed on the amount. FIE then sent checks
to Ballard's attorney for the amount of the appraisal decision. De la Mora and Schless issued an
amendment to the appraisal decision on January 30, 2001, to reflect the intent of the decision to be
a "comprehensive statement of the actual cash value to replace or remediate the structure of the
residence and the groundskeeper's house, the contents of the residence, and the alternative living
expenses, considering only those claims that were properly subject to the appraisal." Duffy did not
participate in the amendment because he no longer had authority to act on behalf of Ballard.

 We will first address FIE's preliminary issue that Ballard waived her right to
challenge de la Mora as FIE's appraiser because she did not raise the issue until after the appraisal
decision was made. Having learned from de la Mora's deposition, taken soon before the appraisal
decision, that he had previously done work for FIE, Ballard contended in an amended petition that
the appraisal decision should be set aside. She claimed that FIE breached the insurance contract by
selecting an appraiser who was neither competent nor independent. The effect of an appraisal
decision is to estop one party from contesting the issue of the value of damages in a suit on the
insurance contract. Hennessey v. Vanguard Ins. Co., 895 S.W.2d 794, 797-98 (Tex. App.--Amarillo
1995, writ denied). As with other affirmative defenses, it is the defendant's burden to raise the issue
of estoppel, Tex. R. Civ. P. 94, which FIE did in an amended answer. Ballard has arguably waived
any challenge because she did not oppose FIE's appraiser until after determination of the appraisal. 
We will nevertheless address FIE's legal and factual sufficiency challenges to the jury's findings
concerning the appraisal.

 FIE argues in a sub-issue concerning the appraisal that the evidence is legally and
factually insufficient to support the finding that the appraisal decision was rendered as a result of
fraud, accident, (7) or mistake. In question seven of the charge, the jury was instructed that fraud means
in part that a material misrepresentation was made and that the speaker made the misrepresentation
with the intent that the other party act on it. Ballard contends that the jury had sufficient evidence
to find fraud because the appraiser intentionally prevented Ballard from receiving like kind and
quality replacement, failed to use available price and quality information, intentionally excluded
items from the appraisal process, and based his calculations on fraudulent bids from unqualified
contractors. There is no evidence in the record to support these contentions. For example, although
Ballard claims that de la Mora intentionally prevented her from receiving like kind and quality
replacement, de la Mora testified that he determined like kind and quality replacement costs during
the appraisal process. One of the contractors who submitted a bid to de la Mora also testified that
he prepared his bid based on like kind and quality materials. Despite the allegation, we find no
evidence from which a reasonable jury could infer that the appraiser intentionally prevented Ballard
from receiving like kind and quality replacement.

 The evidence also does not show that anyone intentionally excluded items from the
appraisal. At oral argument, Ballard contended that she wanted to submit "everything" in the
appraisal but that FIE refused. Although Ballard made fourteen separate claims between December
1998 and August 1999, she had only submitted five claims by the time the appraisal process began
in May 1999. FIE's May 27, 1999 letter listed only three of those five claims, but de la Mora
testified that because the entire house had to be remediated, it did not matter which claim numbers
were included. Additionally, the amendment to the appraisal decision stated that the decision "was
intended to be a comprehensive statement" of the cost to remediate or replace the house, its contents,
and the groundskeeper's house, plus additional living expenses. There is no evidence that de la
Mora or FIE intended to exclude items from the appraisal. Likewise, de la Mora's reliance on bids
from contractors that he chose does not rise to the level of fraud. Ballard opposed the bids because
some of the contractors had done previous work for FIE and because some of the contractors, such
as the mold remediation company, had never submitted bids for work of this magnitude. A lack of
experience does not equate with making material misrepresentations in a bid. Given that mold
claims were still relatively novel in April 1999, when mold was discovered in Ballard's house, (8) it
is not surprising that the contractors had little experience in the area of mold remediation.

 Ballard objects to the bids solicited by de la Mora in part because she does not agree
with the valuation of the repair and replacement costs. "[A] finding of disparity, even gross
disparity, between an appraisal award and the cost of repair, cannot support a finding of bias or
partiality without additional evidence." Hennessey, 895 S.W.2d at 799. Ballard fails to cite to any
additional evidence. Based on our review of the record, we cannot find any evidence from which
a reasonable jury could infer that the appraisal decision was rendered as a result of fraud.

 Ballard argues that the appraisal decision was also rendered as a result of mistake
because it listed "alternative living expenses" instead of "additional living expenses" for the costs
of Ballard's family living away from their house. The jury was instructed that "mistake" means a
situation in which the appraisers were operating under a mistake of fact such that their award does
not speak to their intention or that the error in the award is so great that it shows gross partiality,
undue influence, or corruption. Here, the "mistake" about which Ballard complains is similar to a
clerical error. De la Mora testified that the term "alternative living expenses" was intended to be the
same as "additional living expenses" and that the mere difference in wording did not affect the
appraisal process. A clerical error that does not affect the intention of the appraisers cannot support
a finding of mistake. See Providence Lloyds, 877 S.W.2d at 878 (column labeled "court award"
instead of "agreed award" did not constitute a mistake). Based on our review of the record, we
cannot find sufficient evidence to support a finding that the appraisal was rendered as a result of
mistake. Viewing the evidence in the light most favorable to Ballard, the evidence is legally
insufficient to support the jury's finding that the appraisal decision was the result of fraud, accident,
or mistake. Weighing all of the evidence, the evidence is also factually insufficient to support the
jury's finding that the appraisal decision was the result of fraud, accident, or mistake. We therefore
sustain FIE's sub-issue, reverse the jury's finding, and render judgment on this finding in favor of
FIE.

 FIE contends in its second sub-issue concerning the appraisal that the evidence is
legally and factually insufficient to support the finding that FIE failed to appoint a competent,
independent appraiser. We agree. Ballard attempted to prove lack of independence because de la
Mora had a pre-existing business relationship with FIE. However, Ballard presented no evidence
that FIE influenced or exercised control over de la Mora. There is no evidence that de la Mora ever
was an employee of FIE or had a financial interest in the claims. Instead, Ballard's evidence shows
an arm's-length business relationship between FIE and de la Mora, which was fully disclosed before
the appraisal decision.

 Ballard presented evidence that: de la Mora's company performed twenty to twenty-five percent of its work for FIE and eighty percent of its work overall for insurance companies; de
la Mora had performed four or five appraisals for FIE before the Ballard appraisal; and that de la
Mora had worked with FIE's attorney ten times since 1996. The showing of a pre-existing
relationship, without more, does not support a finding of lack of independence. Gardner v. State
Farm Lloyds, 76 S.W.3d 140, 143 (Tex. App.--Houston [1st Dist.] 2002, no pet.). De la Mora has
never been an employee of FIE. Further, FIE instructed de la Mora to determine costs on his own,
not from any figures that FIE provided. FIE never told him how to estimate the costs. He had no
restriction on receiving assistance from outside experts. As an independent contractor, de la Mora
amply demonstrated that despite his previous business dealings with FIE, he exercised independent
judgment in the appraisal process; Ballard has directed us to no evidence to the contrary, and we
cannot find any support for her position in the record.

 Ballard attempted to prove lack of competence on the ground that de la Mora had no
experience with molds or mold remediation. The evidence shows, however, that de la Mora was
competent as an appraiser. He has a degree in civil engineering, is a registered professional engineer,
has thirty-three years of experience in structural engineering, and has built hundreds of houses,
including houses comparable to the Ballard house. Because he had no experience with mold
remediation, he retained mold experts to assist him with the remediation estimate. This was no
different than Ballard's appraiser, an attorney, retaining mold experts to assist him with his
estimates. Viewing the evidence in the light most favorable to Ballard, we conclude that the
evidence is legally insufficient to support the jury's finding that FIE failed to appoint a competent,
independent appraiser. Weighing all of the evidence, the evidence is also factually insufficient to
support the jury's finding that FIE failed to appoint a competent, independent appraiser. We
therefore sustain FIE's sub-issue, reverse the jury's finding, and render judgment on this finding in
favor of FIE.

 Because we conclude that the appraisal was not rendered as a result of fraud, accident,
or mistake and that the appraiser was competent and independent, the appraisal decision is binding
and enforceable. Wells, 919 S.W.2d at 683. We thus sustain FIE's third issue. Under the terms of
the insurance contract, each party must pay its own appraiser and bear the other expenses of the
appraisal and umpire equally. Therefore, we reverse the jury's award of $176,000 to Ballard for her
reasonable and necessary costs of the appraisal process and render that Ballard take nothing on this
claim. Given, however, that Ballard's claim for breach of the duty of good faith and fair dealing is
statutorily based and extra-contractual, outside of the bounds of the appraisal decision, Ballard's
damages are not limited to the amount of the appraisal decision.


Knowing Violation

 In its seventh issue, FIE challenges the legal sufficiency of the jury's finding that FIE
knowingly engaged in deceptive acts or practices toward Ballard, contending that there is no
evidence to support this finding. We agree. "Knowingly," as the district court correctly charged the
jury, is the "actual awareness of the falsity, unfairness, or deception of the conduct in question." 
Tex. Bus. & Com. Code Ann. § 17.45(9) (West 2002). "[A]ctual awareness may be inferred where
objective manifestations indicate that a person acted with actual awareness." Id. "Actual awareness"
does not mean merely that a person knows what he is doing; rather, it means that a person knows that
what he is doing is false, deceptive, or unfair. In other words, a person must think at some point,
"Yes, I know this is false, deceptive, or unfair to [the other person], but I'm going to do it anyway." 
St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co., 974 S.W.2d 51, 53-54 (Tex. 1998). Actual
awareness is more than conscious indifference toward another's rights or welfare. Id. at 54. We
must affirm the jury's finding if we find more than a scintilla of evidence that FIE's conduct fit
within the definition of "knowingly." See Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499
(Tex. 1995).

 There is some evidence from which the jury could have found that FIE breached its
duty of good faith and fair dealing toward Ballard, but there is no evidence in the record that FIE was
actually aware that its actions toward Ballard were false, deceptive, or unfair--that is, that FIE was
more than consciously indifferent to Ballard's rights and welfare. Under the St. Paul Surplus test,
relied upon by both parties, we must find that someone with FIE must have had a subjective
awareness of the falsity, deception, or unfairness before FIE may be held to have acted knowingly. 
Ballard admits that a single act does not rise to the level of knowing conduct and without citation
to the record tries to paint a "knowing" picture from the pattern of acts relied upon for her lack of
good faith and fair dealing claim. Ballard contends, for example, that McConnell's plumbing test
letter was a knowing misrepresentation. McConnell based this statement on information that she
received from the plumbing company, and we cannot say this is evidence from which a reasonable
jury could infer that McConnell made a knowing misrepresentation. She had no conversation with
Ballard about the plumbing test, instead simply forwarding information after she received the report
from the plumbing company. Additionally, FIE relied on the statement that "complete plumbing
tests" were made as much as Ballard did.

 Ballard further argues that FIE knowingly refused to pay an estimate from one of its
bidders. Ballard makes no citation to the record for this contention, and we cannot find any support
for it in our review of the record. Ballard next contends that FIE "intentionally withheld" approved
claim funds to gain leverage to settle all matters in controversy. We disagree. Although the first
payment for the hardwood floor damage may have taken longer than necessary, FIE did pay all but
one of Ballard's claims, both before and after she filed suit against FIE. The record does not contain
evidence that FIE knowingly withheld claim payments to gain leverage.

 Ballard also argues that FIE intentionally made payments based on sham and
fraudulent bids from contractors who refused to perform work for the amount of the bids and who
were retained as FIE's experts. Although "sham and fraudulent bids" was one of Ballard's themes
during the trial, we cannot find any evidence to support this theme. FIE obtained bids from many
contractors during the course of handling the claims and paid the claims according to its own
valuation, assisted by the bids. Ballard also attempted to show that FIE based its payments on
expired bids, because two companies that had made bids would not do the work for Ballard at the
prices they had quoted to FIE. They in fact would not do the work because they had been retained
as FIE's expert witnesses by that time. Both Ballard and FIE hired contractors involved in the claims
as its experts in the trial, which is not itself unreasonable because they were familiar with the damage
to the Ballard home. The record does not contain evidence that any of FIE's conduct concerning its
bids from contractors was knowingly false, deceptive, or unfair.

 Ballard next argues that FIE improperly invoked the appraisal provision to gain
leverage against her. FIE had a right to invoke the appraisal provision under the terms of the
homeowner's insurance policy and did so when mediation attempts failed. See, e.g., Gardner, 76
S.W.3d at 142. There is no evidence in the record from which a reasonable jury could infer that this
conduct was knowingly false, deceptive, or unfair. Nor was the appointment of an appraiser with
a previous business relationship with FIE evidence of knowing conduct. A previous business
relationship, standing alone, is not probative of knowingly false, deceptive, or unfair conduct. Id.
at 143. De la Mora disclosed his relationship with FIE in his deposition, taken before the appraisal
decision was issued. Ballard did not object to de la Mora until after receiving that decision.

 Finally, Ballard argues that FIE intentionally withheld estimates and information from
de la Mora. De la Mora testified, however, that FIE told him that he had to arrive at his own
estimates, independent of anything that FIE had. FIE did so because the insurance policy required
that de la Mora be independent. Complying with the terms of the insurance policy is no evidence
of knowingly false, deceptive, or unfair conduct. The only evidence that might support a finding of
knowing conduct, which Ballard did not raise with regard to this issue, is that McConnell made a
misrepresentation to Ballard that she needed more time to evaluate the claim, when in fact she
needed time to obtain authority from her supervisors to pay the claim. Although McConnell
admitted at trial that she needed more time to gain authority, not to investigate, we cannot say that
this was part of a pattern of knowing conduct or that this conduct resulted in damages to Ballard. 
It merely delayed payment of the first claim by less than three weeks.

 In examining the finding that FIE breached its duty of good faith and fair dealing, we
focused on whether FIE acted reasonably in handling Ballard's claims. See Giles, 950 S.W.2d at 56;
Lyons, 866 S.W.2d at 601. The test for finding knowing conduct, enunciated in St. Paul Surplus,
is much more stringent: we must find some evidence in the record that someone with FIE must have
had a subjective awareness of the falsity, deception, or unfairness. See Connell Chevrolet Co. v.
Leak, 967 S.W.2d 888, 893 (Tex. App.--Austin 1998, no pet.). None of the evidence to which
Ballard points demonstrates such a subjective awareness. Because the record contains no evidence
that FIE engaged in knowingly false, deceptive, or unfair conduct, we sustain FIE's seventh issue
challenging the legal sufficiency of this finding. See Croucher, 660 S.W.2d at 58. Accordingly, we
reverse the jury's finding and render judgment on this issue in favor of FIE.

 The jury awarded punitive damages and mental anguish damages based on conduct
committed "knowingly or fraudulently." Under the insurance code, a party may recover punitive
damages and mental anguish damages only if the jury finds that the violation was committed
knowingly. Tex. Ins. Code Ann. art. 21.21, § 16(b)(1) (West Supp. 2003) (concerning punitive
damages); State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 435-36 (Tex. 1995) (concerning
mental anguish damages). The DTPA also requires a knowing finding to recover these damages. 
Tex. Bus. & Com. Code Ann. § 17.50(b)(1) (West 2002); Gulf States Utils. Co. v. Low, 79 S.W.3d
561, 566 (Tex. 2002); see also Tex. Civ. Prac. & Rem. Code Ann. § 41.003(c) (West 1997):


If the claimant relies on a statute establishing a cause of action and authorizing
exemplary damages in specified circumstances or in conjunction with a specified
culpable mental state, exemplary damages may be awarded only if the claimant
proves by clear and convincing evidence that the damages resulted from the specified
circumstances or culpable mental state.


Having found no evidence of a knowing violation, we must reverse the jury's awards of punitive
damages and mental anguish damages. We therefore need not address FIE's eighth and ninth issues
that the evidence is legally and factually insufficient to support these findings. We render judgment
that Ballard take nothing on her claims for punitive damages and mental anguish.


No-Evidence Motion for Summary Judgment on Concurrent Causation

 FIE argues in its sixth issue that the district court erred in granting Ballard's no-evidence motion for summary judgment on concurrent causation. We will apply the general
standards for reviewing a grant of a no-evidence motion for summary judgment. See, e.g.,
Holmstrom, 26 S.W.3d at 530. Because the district court's order does not specify the ground or
grounds relied on for its ruling, we will affirm the summary judgment if any of the theories Ballard
advanced are meritorious. See Carr, 776 S.W.2d at 569.

 FIE asserted in its second amended answer that Ballard had the burden of segregating
damages among covered and non-covered losses, under the doctrine of concurrent causation. Under
this doctrine, when covered and non-covered perils combine to create a loss, the insured is entitled
to recover only that portion of the damage caused solely by the covered peril. Travelers Indem. Co.
v. McKillip, 469 S.W.2d 160, 162 (Tex. 1971); Wallis v. United Servs. Auto. Ass'n, 2 S.W.3d 300,
302-03 (Tex. App.--San Antonio 1999, pet. denied). The doctrine of concurrent causation is not
an affirmative defense or an avoidance issue; rather, it is a rule embodying the basic principle that
insureds are not entitled to recover under their insurance policies unless they prove that their damage
is covered by the policy. Wallis, 2 S.W.3d at 303. Thus, an insured may only recover for the amount
of damage caused solely by the covered peril. Id. The burden is on the insured to prove coverage. 
Id. The insured must therefore present some evidence upon which the jury can allocate the damages
attributable to the covered peril. Id. Because allocation is central to the claim for coverage, an
insured's failure to carry the burden of proof on allocation is fatal to the claim. Id. The insured must
attempt to segregate the loss caused by the covered peril from the loss caused by the excluded peril. 
Id.

 The doctrine of concurrent causation is inapplicable in this case for two reasons. 
First, FIE never denied any claim at issue in this appeal on the ground that the claim was a non-covered peril. Second, FIE asserted the doctrine of concurrent causation pursuant to article 21.58(b)
of the insurance code, which states that "[i]n any suit to recover under a contract of insurance, the
insurer has the burden of proof as to any avoidance or affirmative defense that must be affirmatively
pleaded under the Texas Rules of Civil Procedure." Tex. Ins. Code Ann. art. 21.58(b) (West Supp.
2003). All of Ballard's claims presented to the jury were extra-contractual, beyond recovery under
the contract of insurance. Therefore, we overrule FIE's sixth point of error and affirm the district
court's ruling granting Ballard's no-evidence summary judgment on concurrent causation.


District Court's Evidentiary Rulings

 FIE contends in its fifth issue that the district court abused its discretion and deprived
FIE of a fair trial by excluding evidence of settlement offers made during mediation, some instances
of Ballard's conduct toward FIE's adjusters, and de la Mora's testimony that Ballard's lawyers
delayed the appraisal process. FIE further argues that the district court abused its discretion by
allowing evidence about the possible health effects of mycotoxins from molds. We apply an abuse
of discretion standard to the question of whether a district court erred in an evidentiary ruling. 
National Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527-28 (Tex. 2000); City of Brownsville v.
Alvarado, 897 S.W.2d 750, 753 (Tex. 1995). We may reverse a district court under this standard only
when we find that "the court acted in an unreasonable or arbitrary manner," Beaumont Bank, N.A.
v. Buller, 806 S.W.2d 223, 226 (Tex. 1991), or "without regard for any guiding rules or principles."
Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998) (quoting Alvarado, 897
S.W.2d at 754).

 When seeking to reverse a judgment based on an improper evidentiary ruling, a
complaining party "need not prove that but for the error a different judgment would necessarily have
been rendered, but only that the error probably resulted in an improper judgment." Alvarado, 897
S.W.2d at 753; accord Malone, 972 S.W.2d at 43. To prevail, the party must demonstrate that "the
judgment turns on the particular evidence excluded or admitted." Alvarado, 897 S.W.2d at 753-54.
We review the entire record to determine whether a party has met this burden. Id. at 754. If any
legitimate basis exists to support a district court's evidentiary ruling, then we must uphold the court's
decision. Malone, 972 S.W.2d at 43; State Bar v. Evans, 774 S.W.2d 656, 658 n.5 (Tex. 1989)
(citing McCormick on Evidence § 52, at 131 (3d ed. 1984)).

 FIE argues that its offer of $734,000 at mediation and Ballard's demand of no less
than $10 million plus media rights should be admissible to show that FIE attempted to settle in good
faith and to counter the implication that FIE could have settled in May 1999. Discussions in
alternative dispute resolution proceedings are generally confidential and inadmissible as evidence
against a participant in any judicial proceeding. Tex. Civ. Prac. & Rem. Code Ann. § 154.073(a)
(West Supp. 2003). Evidence of conduct made in settlement negotiations can be admissible if
offered for a purpose other than to show liability, such as "negativing a contention of undue delay." 
Tex. R. Evid. 408. However, as the district court stated, a "cloak of confidentiality" surrounds
mediation, and the cloak should be breached only sparingly.

 FIE cites Avary v. Bank of America, N.A. for the proposition that it should have been
able to disclose evidence of Ballard's conduct during the mediation. 72 S.W.3d 779 (Tex.
App.--Dallas 2002, pet. denied). Avary is distinguishable: it concerned a bank's breach of fiduciary
duty in rejecting a higher settlement offer during mediation. The court allowed evidence of the
bank's conduct during mediation because it went to the heart of the parties' dispute. Id. at 796. 
Here, the district court excluded this evidence primarily because FIE's conduct was at issue, not
Ballard's. See Tex. Ins. Code Ann. art. 21.21, § 4(10)(a)(ii) (conduct in question is whether insurer
"fail[ed] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with
respect to which the insurer's liability has become reasonably clear").

 FIE's reliance on two other cases allowing evidence of settlement negotiations is also
misplaced. See U.S. Fire Ins. Co. v. Millard, 847 S.W.2d 668 (Tex. App.--Houston [1st Dist.]
1993, orig. proceeding); State Farm Mut. Auto. Ins. Co. v. Wilborn, 835 S.W.2d 260 (Tex.
App.--Houston [14th Dist.] 1992, orig. proceeding). In both cases, because the entire basis of the
claim was the amount of the insurance company's settlement offer, it was necessary for the court to
admit settlement negotiation evidence. Here, although the district court could have admitted
evidence of Ballard's demands at mediation for the purpose of countering her contention that FIE
unduly delayed in paying her claims, see Tex. R. Evid. 408, he excluded the evidence because of the
danger of unfair prejudice and because of the general rule that settlement discussions are
confidential. In light of the standard of review, we decline to breach the "cloak of confidentiality"
that exists to encourage settlement discussions. See Wilborn, 835 S.W.2d at 261. Accordingly, we
hold that the district court did not act in an unreasonable or arbitrary manner or without regard for
any guiding rules or principles in excluding evidence of settlement offers made during mediation. 
Beaumont Bank, 806 S.W.2d at 226. Further, FIE has failed to show how the exclusion of this
evidence led to the rendition of an improper judgment.

 FIE next argues that the district court abused its discretion in excluding certain
evidence of Ballard's interaction with FIE's adjusters. FIE asserts that the jury could not properly
determine whether FIE acted reasonably without hearing evidence of Ballard's conduct, which FIE
alleges obstructed FIE's efforts to adjust her claims, caused delay, and generally defeated FIE's
attempts to settle. Evidence that FIE attempted to admit included Ballard's threats to use her $44
million trust fund to fight FIE and to snort stachybotrys if necessary to hurt FIE. The district court
excluded the character evidence after balancing what he termed the "extremely, extremely limited
probative value" of the evidence against the danger of unfair prejudice, confusion of issues, and
misleading the jury. See Tex. R. Evid. 403, 404. Further, he specifically excluded the evidence
about Ballard's wealth because courts "try to keep those kinds of tawdry considerations out of the
fact-finding process."

 Although other evidence of Ballard's conduct may have added coloratura to the trial,
there was ample evidence before the jury showing the flavor of Ballard's conduct. For example, the
jury saw dozens of letters that Ballard sent to FIE throughout the claims-handling process. As early
as mid-January 1999, Ballard complained in a letter to McConnell about "your 'experts' traipsing
in and out of my house." In a March 8, 1999, letter to McConnell, Ballard wrote, "I hope you take
great comfort knowing while you are out trying to manipulate the facts and throw an inadequate sum
of money at me that doesn't get me to first base, my family is living in a house that clearly is
dangerous." She ended her letter with, "You should be ashamed." After moving out of the house,
she demanded that FIE pay for accommodations at the expensive Four Seasons Hotel in Austin as
"the only thing I've found suitable." These letters and many others more than adequately conveyed
the flavor of Ballard's contentious stance toward FIE, which began within weeks of her filing the
December 17, 1998 claim. Additionally, the jury heard evidence that Ballard changed both lawyers
and appraisers during the claims-handling and litigation process, which it could have inferred as a
contribution to delays.

 While the jury did not get to see the full picture of Ballard's conduct, we believe that
it saw enough of the picture to evaluate whether her conduct hampered FIE's efforts. Accordingly,
we hold that the district court acted within the bounds of its discretion in excluding certain evidence
of Ballard's interaction with FIE's adjusters. More importantly, FIE failed to demonstrate how the
exclusion of this evidence led to the rendition of an improper judgment.

 FIE further asserts that the district court erred in excluding testimony by de la Mora
that Ballard "obstructed and delayed" the appraisal process. FIE argues that by excluding this
testimony, the "court permitted Ballard to profit from the false impression that [FIE] delayed the
process." The jury heard evidence that the appraisal process began in May 1999 and did not
conclude until November 2000. But it heard no evidence about why the process took so long
because the judge granted Ballard's motion in limine that no mention be made of Ballard or her
appraiser delaying the appraisal process. The district court's practice of allowing jurors to question
witnesses at the end of their testimony resulted in the district court posing the following question to
de la Mora:


THE COURT: Why did the appraisal process take 18 months?


THE WITNESS: The appraisal process took 18 months because the Ballard
attorneys kept keeping us from going to the house to do the work
that we needed to do.



The district court then excused the jury, reprimanded de la Mora, and warned that he would be in
contempt of court if he "advocated" for FIE again. The jury returned, and the district court requested
that they disregard de la Mora's answer.

 For the same reasons as discussed concerning Ballard's conduct toward FIE, we
conclude that the district court acted within the bounds of its discretion in excluding evidence of
Ballard's conduct purportedly delaying the appraisal process and that FIE has failed to show how
the exclusion of this evidence led to the rendition of an improper judgment.

 In its last contention that the district court abused its discretion, FIE argues that the
district court should not have allowed admission of evidence that mycotoxins from molds can cause
serious personal injury. FIE urges that the district court should have excluded all evidence in this
area because it granted FIE's motion to exclude Allison's causation experts, who would have
testified about the health effects of exposure to the mycotoxins.

 Among the few references to the health effects is that one of the mycotoxins is a
known liver carcinogen and, in a letter from Ballard put into evidence by FIE, that one of the Ballard
pets had a "terrible skin problem caused by Stachybotrys exposure." The district court, after careful
deliberation, allowed this evidence because it was relevant to Ballard's mental anguish claim, not
for her own fear of getting ill but her concern for her family. (9) The district court put a further
safeguard in place by twice instructing the jury that personal injury claims were not part of the case. 
The general rule is that an instruction to disregard a subject not part of the case will cure error. See,
e.g., Fowler v. Garcia, 687 S.W.2d 517, 520 (Tex. App.--San Antonio 1985, no writ). We therefore
hold that the district court acted within the bounds of its discretion in allowing evidence of the health
effects of mycotoxins and that FIE has failed to show how the admission of this evidence led to the
rendition of an improper judgment. Having found no abuse of discretion in the district court's
evidentiary rulings of which FIE complains, we overrule FIE's fifth issue.


Attorneys' Fees

 FIE contends in its tenth issue that there is insufficient evidence of reasonable and
necessary attorneys' fees and thus that we should reverse the jury's award of $8.9 million in fees to
Ballard's attorneys. A plaintiff who prevails in a DTPA cause of action "shall be awarded court
costs and reasonable and necessary attorneys' fees." Tex. Bus. & Com. Code Ann. § 17.50(d) (West
2002). A plaintiff who prevails in a cause of action under article 21.21 of the insurance code may
obtain "the amount of actual damages plus court costs and reasonable and necessary attorneys' fees." 
Tex. Ins. Code Ann. art. 21.21, § 16(b)(1) (West Supp. 2003).

 While we review the amount that the jury awarded under a legal sufficiency standard,
we review the trial court's decision to grant or deny fees at all under an abuse of discretion standard. 
See Bocquet v. Herring, 972 S.W.2d 19, 22 (Tex. 1998) (Baker, J., dissenting); Hunt v. Baldwin, 68
S.W.3d 117, 135 n.8 (Tex. App.--Houston [14th Dist.] 2001, no pet.). One of the factors in
determining the reasonableness of an award of attorneys' fees is the amount of damages awarded.
Wayland v. City of Arlington, 711 S.W.2d 232, 233 (Tex. 1986). However, this is only one among
many factors to consider. See Gill Sav. Ass'n v. International Supply Co., 759 S.W.2d 697, 703-04
(Tex. App.--Dallas 1988, writ denied) (detailing twelve factors normally used in determining
reasonableness of award of attorneys' fees). Because we are remanding the question of attorneys'
fees, we need not decide whether the district court abused its discretion.

 Factors that a fact finder should consider when determining the reasonableness of a
fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and
the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the
particular employment will preclude other employment by the lawyer; (3) the fee customarily
charged in the locality for similar legal services; (4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of
the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer
or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained
or uncertainty of collection before the legal services have been rendered. See Arthur Andersen &
Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997) (citing Tex. Disciplinary R. Prof.
Conduct 1.04, reprinted in Tex. Govt. Code Ann., tit. 2, subtit. G app. A (West 1998) (Tex. State
Bar R. art. X, § 9)). The fact finder should consider a contingent fee agreement, but "the plaintiff
cannot simply ask the jury to award a percentage of the recovery as a fee because without evidence
of the factors identified in rule 1.04, the jury has no meaningful way to determine if the fees were
in fact reasonable and necessary." Id. at 818-19. The plaintiff must ask the jury to award fees in a
specific dollar amount, not as a percentage of recovery. Id. at 819.

 Here, the jury heard evidence of the above factors from Ballard's attorneys' fees
expert, Richard Cedillo. He discussed all eight factors from rule 1.04, including the quality of the
attorneys on the case and the time required. He stated that a contingent fee contract of thirty-five
percent on the first eight million and forty percent on any award above that amount was fair. FIE
contends that the evidence is insufficient partly because Ballard's attorneys did not submit hourly
time sheets. Cedillo testified, based on his experience on complex cases and review of the Ballard
file, that Ballard's attorneys spent a great deal of time on her case because of the paper, motions,
preparation for seventy depositions, trial preparation, and complex issues involved. He further
explained that Ballard's attorneys did not keep hourly time sheets because they were under a
contingent fee contract, not an agreement based on an hourly fee. Thus, Ballard would not expect
statements about their time on the case. Having heard Cedillo's testimony, the jury awarded fees in
a specific dollar amount, as requested in the charge. Cedillo's coverage of the factors stated in
Arthur Andersen, including the suggestion that the dollar amount be based on the contingent fee, are
sufficient evidence to support the award of attorneys' fees. See Vingcard A.S. v. Merrimac
Hospitality Sys., Inc., 59 S.W.3d 847, 870 (Tex. App.--Fort Worth 2001, pet. denied) (jury award
of dollar amount based on contingent fee, after hearing testimony of the rule 1.04 factors, met the
Arthur Andersen requirements). Accordingly, we overrule FIE's tenth issue and hold that there was
legally sufficient evidence of reasonable and necessary attorneys' fees.

 We cannot say, however, that the award of $8.9 million is still reasonable, given that
we have significantly reduced the damages awarded by the jury. We remand the determination of
attorneys' fees to the district court for further proceedings consistent with this opinion.


Article 21.55 Damages

 FIE asserts in its eleventh issue that there was no basis for awarding or calculating
any interest penalty under article 21.55 of the insurance code. The purpose of article 21.55 is to
obtain prompt payment of claims pursuant to policies of insurance, and its provisions are to be
liberally construed to promote this purpose. See Tex. Ins. Code Ann art. 21.55, § 8 (West Supp.
2003). Article 21.55 provides that "if an insurer delays payment of a claim following its receipt of
all items, statements, and forms reasonably requested and required . . . for more than 60 days, the
insurer shall pay damages and other items as provided for in Section 6 of this article." Tex. Ins.
Code art. 21.55, § 3(f). Section six provides for eighteen percent annual interest on the amount of
the delayed payment, together with reasonable attorneys' fees. Id. § 6.

 FIE argues that there was no basis for the 21.55 penalty because Ballard did not prove
or obtain jury findings that FIE violated the article. As discussed above, we have found some
evidence to support the jury finding that FIE breached its duty of good faith and fair dealing in
"[f]ailing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim
when the insurer's liability has become reasonably clear." Tex. Ins. Code Ann. art. 21.21,
§ 4(10)(a)(ii). McConnell unequivocally testified that FIE had all of the information that it needed
to pay the costs of remediation by May 17, 1999. FIE did not pay any of those costs until August
30, 1999, more than sixty days later. Therefore, FIE subjected itself to the provisions of article
21.55.

 But the record demonstrates that FIE did not cause all of the delay. Ballard rejected
FIE's August 30, 1999 payments of $382,738.69 on the ground that they were based on invalid bids,
but then accepted checks for the same amounts on February 17, 2000. We find, therefore, that the
district court erred in calculating eighteen percent interest on $382,738.69 between August 30, 1999
and February 17, 2000, because Ballard caused that delay in payment. Otherwise, we find that the
evidence supports the district court's calculations of the eighteen percent penalty, based on evidence
that FIE delayed full payment of Ballard's claims for more than sixty days. Accordingly, we remand
the statutory penalty issue to the district court for recalculation in accordance with this opinion.


CONCLUSION

 Because we find no error in the district court's rulings concerning Allison's claims,
we affirm the rulings of the district court in granting FIE's motion to exclude his causation experts
and FIE's no-evidence motion for partial summary judgment pertaining to Allison's personal injury
claims. Accordingly, we affirm the district court's judgment dismissing Allison's personal injury
claims.

 We hold that probative evidence supports the district court's denial of FIE's motion
to transfer venue to Hays County. We further conclude that the district court did not abuse its
discretion in the evidentiary rulings of which FIE complains. We also find sufficient evidence to
uphold the jury's findings that FIE breached its duty of good faith and fair dealing toward Ballard
and that FIE committed a DTPA violation. After a thorough review of the evidence in the record,
and with deference to the province of the jury, we hold that the evidence is both legally and factually
insufficient to uphold the jury's verdict on several other grounds of recovery. We find insufficient
evidence to support the jury's findings of unconscionability or fraud. We additionally find
insufficient evidence to support the jury's findings that FIE failed to appoint a competent,
independent appraiser or that the appraisal decision was a result of fraud, accident, or mistake. 
Because the court's charge specified that findings of either a breach of the duty of good faith and fair
dealing or a DTPA violation are sufficient to uphold the jury's award of actual damages, we affirm
the actual damages award in part, in the amount of $4,006,320.72, in addition to prejudgment and
postjudgment interest as stated in the final judgment. We reverse the award of $176,000 for
Ballard's reasonable and necessary costs of the appraisal process.

 We further conclude that there is no evidence to support the jury's finding that FIE
"knowingly" breached its duty of good faith and fair dealing toward Ballard. Because a finding of
a knowing violation is required to uphold punitive and mental anguish damages, we reverse the
jury's awards for these damages and render judgment that Ballard take nothing for punitive and
mental anguish damages. We uphold the district court's award of the article 21.55 statutory penalty
in part and remand the penalty for recalculation in accordance with this opinion. We find sufficient
evidence to support the award of attorneys' fees but cannot say that the amount of the award is
reasonable, given our significant reduction of the jury's damages awards. Therefore, we remand the
issue of attorneys' fees to the district court for further proceedings consistent with this opinion.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Patterson and Puryear

Affirmed in Part; Reversed and Rendered in Part; Reversed and Remanded in Part

Filed: December 19, 2002

Publish

1. The parties to this appeal are Mary Melinda Ballard and her husband, Ronald Allison, the
plaintiffs in the case below, and Fire Insurance Exchange, the defendant in the case below. Ballard
owns title to the house, and thus the homeowner's insurance is in her name.
2. A "mycotoxin" is a toxic substance produced by mold.
3. FIE also now argues that the district court failed to recognize the abrogation of the
dominant-purpose test. FIE fails to acknowledge that it based its argument at the hearing on the
dominant-purpose test.
4. In light of the addition of section 15.004, we need not discuss the cases, cited by both sides,
that base their reasoning on the dominant-purpose test.
5. Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3247
, 
amended Act of May 8, 1995, 74th Leg., R.S., ch. 138, § 2, 1995 Tex. Gen. Laws 978, 980. The
predecessor to section 15.011 contained the phrase "for recovery of damages to real property" until
1983. See Act of June 17, 1983, 68th Leg., R.S., ch. 385, 1983 Tex. Gen. Laws 2119 (Tex. Rev. Civ.
Stat. Ann. art. 1995, since repealed).
6. In construing a statute, we may consider and, in this case, are informed, by the statute's
title. See Tex. Govt. Code Ann. § 311.021(7) (West 1998).
7. Ballard does not contend that the appraisal decision was rendered as a result of accident.
8. In 2001, "
Farmers registered more than 12,000 mold claims, up from 12 in 1999. Allstate
says its monthly tally of such claims in Texas climbed to 1,000 in the first three months of this year,
up from 40 a year ago." Harsh Policies: Hit With Big Losses, Insurers Put Squeeze on Homeowners,
Wall Street Journal, May 14, 2002, at A1.
9. FIE, relying on Temple-Inland Forest Products Corp. v. Carter, asserts that mental anguish
for fear of disease is no longer compensable in Texas. See 993 S.W.2d 88, 93 (Tex. 1999). FIE
interprets Temple-Inland too broadly. The case only addresses fear of an asbestos-related disease
in the absence of symptoms of any disease. Id. at 93 ("The question . . . is whether . . . fear of an
increased risk of developing an asbestos-related disease when no disease is presently manifest should
be permitted. . . . We conclude that no such action should be recognized.").